# COMMONWEALTH OF MASSACHUSETTS

**Barnstable, ss.**

**Superior Court Department**
**Civil Action No.**

*1872 CV 00050*

|  |  |
|---|---|
| **MARK SCIBELLI,** | ) |
| **Plaintiff** | ) |
|  | ) |
| **V.** | ) |
|  | ) |
| **CAS Medical Systems Inc.** | ) |
| **and Mathew Herwig, Kim Strusky,** | ) |
| **Thomas Patton** | ) |
| **Defendants** | ) |
|  | ) |

**Former MCAD DK#17BEM00977  11/8/17)**

## COMPLAINT FOR AGE DISCRIMINATION, WRONGFUL TERMINATION  & UNPAID  SALES COMMISSIONS with DEMAND FOR A TRIAL BY JURY

**Parties**

1.     Plaintiff Mark Scibelli, resides at 50 Indian Trail, Barnstable, MA 02630.

Complainant is 63 years of age; his date of birth is 12/26/54 and therefore is of a protected class

under Federal and Massachusetts Law.

2.     Defendant employer, CAS Medical Systems, Inc. (hereinafter "CASMED") is a

domestic corporation with its principal place of business in Branford, CT.  CASMED is engaged

in the business of manufacturing medical cerebral oximetry monitors and accompanying single

use sensors, and accessories for use in Cardiac Surgery, EP, ECMO, BCS, Thoracic & Pediatric

Surgery;.  CASMED regularly does business in the Commonwealth of Massachusetts.

3.     Defendant Mathew Herwig, (hereinafter "Herwig"), whose age is in the Forties-,

is employed by CASMED as sales manager over the New England Region, Kim Strusky

1

(hereinafter "Strusky") is VP  US Sales and Thomas Patton (hereinafter "Patton") is CEO.

**Plaintiffs Employment With CASMED**

4.      Plaintiff worked for CASMED from April of 2015 to October 2016.  Plaintiff was found and recruited by Mr. Timothy Brennan of The Syverson Group, who is an industry professional with a talent search firm contracted to find a superior medical device sales professional for CASMED. After much screening, testing and interviews, Plaintiff was subsequently hired by then District Sales Manager, Kevin Phelan.   Plaintiff had over thirty years of successful experience, with top companies, in the sale of medical devices including Medical Capital Equipment with disposable components.  Prior to his  hiring in  2015, CASMED represented the New England territory as having a "worst in the country" sales performance and recruited Plaintiff to come to work as a Region Sales manager in the New England Region to remedy its poor revenue production.

CASMED openly acknowledges Plaintiff quickly and adeptly stabilized existing accounts, fending off competition at existing centers, expanded their disposable usage and monitor install base.  At hire the territory sales were well below national average and more alarmingly, declining.

5.      From April 2015 through October 2016, Plaintiff had satisfactory performance reviews, met his sales quotas (which are annual) and exceeded major performance metrics above the majority of his younger counterparts.  This including two atypical revenue capital sales in New England at Boston Childrens Hospital, the first of which with revenue of $144,000 capital sale along with a long term sensor contract which Plaintiff closed on the last business afternoon of 2015,  **bringing great benefit to**

**CASMED who realized an unexpected 2015 over revenue projection finish.  IE CASMED would have missed its 2015 revenue goal if not for Plaintiffs expertise of selling rather that "loaning" monitors as was typical at CASMED.  This was of great value to CASMED revenue and with their projections to the investment community.**

This also resulted in a 2015 3rd in salesforce finish for Plaintiff.  Almost exclusively, CASMED loaned its capital component monitors to customers at **No Charge** in exchange for purchase of its disposable sensors, usually without a disposable contract commitment. This last day of the year sale brought CASMED an unexpected over 100% of its year end company quota, to much acclaim by the CASMED Headquarters members in CT.  This is how Plaintiff ended December 2015,  followed by exceeding goals in Q1 2016 and a second atypical Capital Revenue sale of approximately another $132,000 only to be threatened with Probation mid- Q2 2016.

6.      In November of 2015, Defendant Herwig was demoted  by CASMED and made District Sales Manager over the New England region.

7. Despite already having been demoted and reassigned to oversee New England Sales, and while not traveling and at home in Madison CT, Herwig refused repeated requests of Plaintiff to add management gravitas to and meet the principals at the final 10:30 AM  "sales closing meeting" with the Director of Anesthesia and  NICU, CCU, & MICU Department Heads at Children's Hospital Boston to finalize the aforementioned $144,000 1st Capital sale and long term disposable contract with Children's Boston citing an **unfavorable morning AMTRAK schedule**. (Drive time Madison to Children's Boston about 2 1/4 hour)

To fortify CASMED representation at the meeting with a superior manager Plaintiff requested

his District Manager, Kevin Phelan attend the meeting, which he did by flying from Baltimore the night before  .

This commenced a pattern of non support and undermining from Herwig that continued and increased into 2016 and that the Plaintiff now contends marked the beginning of discrimination against him. CASMED HR, VP Sales and CEO were made aware of such complaints.

8.      In January of 2016 a second like sale was made by Plaintiff to Children's Hospital Boston for approximately another $132,000 in more rare recognizable capital revenue.

9. Despite residing in immediate proximity to CASMED Headquarters in Branford CT and having only 4 essentially unused monitors stored in a remote location, Yale New Haven Hospital (hereafter "YNHH")  therefore was producing little disposable sensor usage and sales revenue for CASMED in 2015.  This was of great disappointment to CASMED management.

After attending an argumentative dinner meeting in the spring of 2015 between Patton and the Chief of CVOR at YNHH, the Plaintiff regularly devoted a well documented and  substantial amount of time, travel and effort remediating that dinner meeting's result and in bringing about enormous relationship and sales improvement commensurate to the size, stature and potential of YNHH to CASMED's great benefit in 2016 and presumably much more in 2017.

### The St. Peters Hospital Albany, NY Trial, Sale and Executed Contract Debacle

10. Based on cold call prospecting activity in November 2015 Plaintiff secured a clinical trial of the CASMED system with the CVOR clinicians at St. Peters Hospital Albany, NY who used a competitive system on 100% of its 1100 Cardiac Surgeries every year, representing a projected $175,000 sensor opportunity in a territory that had been producing a declining $535,000/year at time Plaintiff was recruited.

4

Plaintiff secured the trial and got it scheduled to start during the second week of December 2015.  Just before Christmas 2015 the clinical trial was completed and won with the St. Peter's CVOR clinical managers deciding to convert to CASMED fully.  After much review, a contract to switch the technology to CASMED was subsequently executed between CASMED, St. Peters CVOR VP and St. Peter's parent company systems Legal and Purchasing Departments at Trinity Health.  4 Monitors and 8 boxes of disposable sensors were initially sold, sent and received by St. Peters.

As the installation of the monitors was underway, the former competitive representative from Medtronic herinafter "MDT", a multidivisional, multibillion dollar conglomerate who provides over a million dollars in products to St. Peters annually represented to St Peters the Cerebral Oximetry business was included in a larger MDT contract and they could not purchase CASMED devices.

11. This move by MDT created a not uncommon potential contractual conflict for St. Peters with both contracts now in force.  In Plaintiffs experience however and based on follow up research this was incorrect and not without caveats.

For example the contract provided for both a 15% net revenue allowance for competitive use as well as a **Standard Carve Out** so hospitals are able to upgrade to dissimilar devices, if the using clinicians or institution determines, differences in design, materials, IP, or clinical data etc make the new device or product superior for patient safety and outcomes.  This is a fairly common occurrence in hospital sales and usually can be readily resolved by working with the

institution who's already motivated to (1)switch to a newer/better technology for their clinician and patient's benefit, (2) does not wish to be forced to continue use of an inferior device and (3)instead expect flexibility from the existing vendor. Typically, they just need some counter-point guidance thru the process involving both vendors, so they don't fear forfeit of some rebates or the like, such fears to which the existing vendor tries to capitalize on. Establishing this as a legitimate option in the understanding of the institutions administrators is the main predicate to be established at such a meeting, with only common negotiations with both vendors to follow.

**The CASMED system pricing would save St. Peters approximately $100,000 on adoption, provided for more no charge monitors than MDT, thereby suppling previously unequipped ECMO, and St. Peter's clinicians had determined it was vastly superior clini-cally, these factors gave Plaintiff great leverage to set up a resolution of this matter.**

Plaintiff had handled such negotiations successfully a number of times over his career and upon eventually securing this key meeting with the St. Peters VP to establish options, Plain-tiff was confident CASMED could prevail and maintain this very small piece of MDT business at St. Peter's to the enormous benefit of CASMED and the Plaintiff.

Plaintiff had kept Herwig apprised of developments which Plaintiff had managed alone, including Herwig declining to attend any of the enormously important St Peter's trial (again no satisfactory train service from Madison CT), but Herwig now insisted on traveling to Albany and attending the contract resolution meeting with the VPCVOR.

12. In preparation for that meeting Herwig agreed to let Plaintiff lead the meeting know-ing the client had questions and concerns coming into the dialogue that Plaintiff was much better able to address given his experience and specific account knowledge.

Upon introduction to the St. Peters principals at that meeting start, Herwig introduced himself, and immediately took over and gave a long obsequious monologue re-enforcing every concern the VP had, while asking no qualifying questions, posing no offsetting benefits or reference of St. Peters clinician support, the very positive trial results and never touching on the available contractual carve outs available and how this matter could be easily resolved in St. Peters complete favor.

The VPCVOR whose concerns were not just acknowledged but reinforced by Herwig, rather than being addressed enough work the problem further, immediately thanked him for his understanding and started to move to end the meeting.

Plaintiff then interrupted with a pertinent question, one that had been discussed as strategy originally with Herwig, in an attempt to get the agenda back on track. However as each qualifying question was poised to the CVOR VP, Herwig apologized for Plaintiffs inquiry pulling things irreparably off track. Plaintiff finally stopped Herwig's latest apology with a "please let her answer just one of my questions". At which point despite strong clinical support from St Peter's OR management, better patient care, a solvable stumbling block and the $100,000 in cost savings, the meeting could no longer be salvaged and shortly thereafter St. Peter's confirmed the required 90 day written notice to cancel the contract.

After leaving the meeting Herwig told Plaintiff, "Good Job! It was a real long shot anyway". Plaintiff replied "In my experience, that was a completely winnable situation, why didn't you stick to the plan and why did you keep interrupting?" to which **Herwig angrily replied "well maybe your Fxxxxxg experience is just plain outdated!"**

At that moment in time, while becoming alarmed, Plaintiff still attributed much of this to

Herwig's lack of medical device consultative sales experience and acumen.

However on receiving the confirmation of pending cancelation, Plaintiff wanted to at least salvage the commensurate purchase of sensors that should have been used during the 109 days the contract was in force, which was worth approximately another $15,000 in Sales Revenue. Herwig inexplicably refused to have an invoice issued and ordered Plaintiff not to discuss this contract requirement with the hospital. When Plaintiff objected and asked Herwig for his rationale, to not even attempt to collect the contracted revenue, which Plaintiff had ascertained invoicing was expected by St. Peter's, Herwig said "fine, present it to them verbally but if they call here for relief from the contract I'm not backing you up". Absent CASMED corporate support this was an obvious non-starter which Plaintiff did not pursue

13.     By February 2016 Plaintiff had established a strong clinical and personal relationship with the YNHH Chief of CVOR anesthesia and had identified the chiefs need to conduct publishable new research. By this time Plaintiff and the Chief of CVOR had concluded a programs groundwork, study protocol and structure to include a massive increase of both research and commercial usage of CASMED Cerebral Oximetry sensing technology.

The YNNH Chief of CVOR had found and recruited a new clinician with specific background to manage this developed multi-modality effort. The few old CASMED monitors at YNNH where exchanged  for new CASMED technology and 12 monitors were eventually added into YNHH to support the new initiatives projected dramatic increase in clinical and research usage and disposable sensor volume. **Also, for the first time, with the Chiefs support, YNHH physically installed CASMED monitors and stored sensors in every Adult Cardiac OR Room to facilitate his recommendation to staff to now use CASMED sensors on most cases.**

By this time Plaintiff had already successfully won 3 new evaluations of CASMED new generation monitors into the YNHH Pediatric Cardiac OR, YNHH Liver Transplant Program and the YNHH Neuroscience CCU.

14. A meeting with all key clinicians was organized at YNHH between the Chief and Plaintiff with all key members of the clinical and research group in April 2016, which by now **Herwig** who was originally uninterested in familiarizing himself with any activities with YNHH, **was now insisting he attend.**

15. Immediately prior to this meeting but while at YNHH Herwig suddenly informed Plaintiff that if his sales did not "**recover**" he would be put on a formal Performance Improvement Plan (Hereinafter "PIP") at the beginning of Q3.  Plaintiff was totally shocked by this conversation and inquired why this was being discussed given his 3rd place finish in 2015,  2 large capital revenue sales in December 2015 and January 2016 YNNH project and other progress thus far into early 2016.  Herwig responded it was because he missed his Q1 Sales figures, which as not correct, but Herwig was adamant in his dialogue that a failure to meet sales quota in Q2 was inevitable, which was extremely premature and bewildering, with half the sales quarter remaining, Plaintiff  firmly expected to over achieve handily given his pending projects.  Herwig persisted to speak of the present quarter as lost even given over 5 selling weeks still pending. **Net, there was nothing to "recover" from.**

16. At the scheduled YNHH initiative meeting which followed the PIP discussion, to commence set up and first sensor purchase levels, one of the team lead physicians, who wanted to be fully prepared for study commencement and wished to utilize his first grant installments was asked by Plaintiff, "how many initial sensors would you need to purchase?".

After a brief calculation the team lead responded 900 each sensors.  Plaintiff suggested
300 (enough to monitor only 50-75 patients)  per quarter for the next three quarters would be de-
sirable.  These 3 transactions alone would have provided  a large quota over performance for the
Plaintiff for Q2 2016 and the remainder of the year.

At this point in the meeting Herwig jumped in and interjected "there is absolutely no
need to those purchase those volumes now" and that he would see that a few boxes should be
sent at later times even pointing out "CASMED could drive them in from Branford to New
Haven in no time".

17.   After that meeting, Plaintiff immediately asked Herwig "why as Area Director of
Sales  he would instruct a customer that it would be better to defer and fragment 3 lucrative
and structured orders, that would assure a great fiscal year and after nearly a years inten-
sive work?".  To this Herwig offered no meaningful response whatsoever and walked away
from Plaintiff.  It was at this point, with the illogical PIP "recovery" discussion and a **Sec-
ond major sale sabotaged**, that Plaintiff became convinced Herwig was deliberately
working to undermine his Q2 sales progress to create pretext and justification for the
aforementioned Q3 PIP and eventual termination.

**As part of this business and clinical plan at YNNH Plaintiff soon secured a written
Purchase Order for 5 more CASMED monitors.  Herwig refused to let this PO be processed
and shipped for nearly 6 weeks, leaving Plaintiff to deal with Administrative anger at
YNNH and not releasing the order until it was needed for Herwigs personal District Quota
in the last days of Q2**. This was not CASMEDs practice when product was readily available to
ship as it was at the time.

18.   In December of 2015 or January of 2016 Plaintiff had to bring Herwig to a local meeting he wished to attend at YNNH.  In discussing background prior to the meeting Herwig asked  "how old is the person was we are going to meet?"  Plaintiff replied "about our age".

After the meeting Herwig asked "so was he your age or my age" and then he laughed. This became a "running joke"  which Herwig frequently poised thereafter.

### Herwigs Refusal to Attend & Support major sales opportunities.

At time the Plaintiff was recruited and hired, Herwig was his hiring managers (Phelan) superior.  In late November 2015 Herwig was demoted, the Districts were redrawn and Herwig became Plaintiffs immediate manager. Despite asking to help in anyway possible when in front of his superiors Herwig never said that in private and never responded affirmatively and traveled to support Plaintiff for requested major calls or meetings.


Some Examples:

**Children's Hospital Boston-**The aforementioned combined approximate $276,000 sales with the final 10:30 am sales meeting that Herwig refused to come to from Branford CT because of  an **"unfavorable train schedule"**. (Madison is a 2 1/4 hour drive to Chil-drens)

**The New England Society of Perfusionists Annual Meeting** was held in CT 9 Miles from Herwig's home on a Saturday which he refused to attend or even drop into briefly. Meanwhile The Chief of Cardiac Surgery YNHH where the aforementioned major sales effort was underway was a speaker at this meeting, some of CASMEDs preeminent

existing customers were in attendance and several new "pipeline report" (BPPP)
prospects were also on the list to attend.

**New England Society of Anesthesiologists Meeting Sept 2016 in Portland Maine.**

Plaintiff had formed a relationship with the President of NESA the year before and had
subsequently already secured a pivotal trial of CASMED technologies at her institution,
Massachusetts General Hospital in August 2016.  Massachusetts General had experienced
unusually positive results with the CASMED system, potentially saving a patients life
during their clinical trial.

Following these results in the President of NESA's case, this meeting was a water shed
event and incredible opportunity for CASMED in New England.  Plaintiff and the Presi-
dent of NESA were in the process of expanding the trial to two other Units within Mass-
achusetts General.  Given the relationship and trial results, The President of the Society
invited Plaintiff to join her at all 3 day meetings social events and dinners to which no
other vendor at the meeting had access.

With that inside access and the Presidents support and introductions to other institutions
key Anesthesiologists, Plaintiff was able to vastly increase the number and quality of
physician contacts and with it a new "pipeline" of prospects at various New England
Hospitals including major institutions such as Dartmouth, Maine Medical Center, UVM
and others.  Herwig was made aware of this unusually positive progress.

Herwig had refused to attend any of this impactful 3 day meeting citing there **"was only
one badge provided for admittance with our meeting fee"** which he knew to be untrue,
2 CASMED badges were provided when Plaintiff arrived at Portland.

Herwig also eventually refused to consider any of the newly developed pipeline of trial growth in reviewing the PIP or the pending expansion, some in writing, of the other OR units at Mass General moving Trials from just the Orthopedic OR, to the Lunder Cardiac OR and the Spine OR the and was in the process of ordering more monitors to equip those Units when Plaintiff was terminated.

Patton

During Plaintiffs  first Anesthesia Society of America meeting in Washington DC at the beginning of his CASMED employment, Plaintiff attended a Dinner Meeting sitting between CEO Patton and Dr. Brookings from Hollywood Hospital who was a car collector, enthusiast and racer.

As Plaintiff spoke knowledgeably regarding vintage car models Patton interrupted and asked several age related questions of Plaintiff and as to how he had such knowledge of the era's discussed.  This culminated in Patton asking directly "how old are you?".

Also, later in 2016, Patton co-traveled with Complainant in the Boston area and attended several meetings with key anesthesia teams during that visit.  During the extensive drive time between hospitals Patton again asked a number of age related and determining questions of Plaintiff including his year of BS graduation etc.

**After Termination Plaintiff learned Patton had made previous recommendations to an independent CASMED distributor to terminate specific sales representatives in the distributors organization because of their "age and older, tired appearance", who Plaintiff will seek a deposition from said party.**

**Strusky**

Strusky's first field visit with CASMED was conducted with Plaintiff at accounts near Branford when Strusky first started as VP Sales at CASMED. Plaintiff put her in front of a number of key physicians and staff producing a very good business day. While reviewing Plaintiffs sales objectives, pipeline and solicited concerns, Strusky stated numerous times "Revenue was Revenue" and unlike her predecessor, Herwig, she didn't care if the sales came from growth from existing customers, new departments and users at existing hospitals, or new hospitals all together. This made total sales and business sense. She "just wanted revenue growth and to exceed forecasts"......

Much later and very concerned, Plaintiff had a second chance for a lengthy discussion with Strusky who he sat with at a Chicago sales meeting White Sox baseball game at Wrigley Field and again shortly thereafter in greater detail in a requested phone conversation regarding the aforementioned PIP, then in force, and the highly unorthodox and repeated behavior of Herwig, to which Strusky's main response was a seemingly angry "I am very taken back by what you've told me today"

**Starting shortly after Strusky assumed her role as VP of Sales at CASMED in 10/15, there was demonstrable systematic, widespread termination of most older sales managers and sales representatives who were replaced with much younger staff.**

**"Performance Improvement Plan" Hereafter "PIP"**

19. In July 2016 Plaintiff was issued a 90 day PIP despite over-achieving 2015 quota, and dramatic over-achievement of revenue in 2015, the 2nd major capital sale at Children's, achieving Q1 2016 Quota, and Herwig's killing of 2 major Q2 2016 Sales (St. Peter's & Yale) . On PIP initiation, Plaintiff pointed out that some criteria required was obviously not within a salespersons power to effect such as precise commencement dates of newly committed Evaluations as they were subject to customer time table.

**Complainant accepted the PIP rather than termination, and maintains he over-achieved all requirements of the PIP.** On 10/05/16 Plaintiff traveled to Syracuse NY after earlier confirmation to do so by Herwig, who had refused multiple requests by Plaintiff to meet in person to finalize the PIP review at its conclusion. Given Plaintiff met the PIP criteria and Herwig's assurances that he should proceed to the calls he had arranged in Upstate NY, it was October, the PIP had expired 9/31, the Plaintiff determined that his employment was no longer at risk. However, the Plaintiff repeated requests to review of PIP in person at Branford as ensure that the PIP was discussed, documented and "put to rest". Given his Q3 2016 over-quota performance Plaintiff did not expect termination.

20. Under the guise of a routine pipeline review phone call, and after Herwig not apparently needing to meet, despite multiple meeting requests, Plaintiff was shocked to be told on the phone by Herwig and Taylor(HR) on 10/06/2016 that he was terminated during his drive home from Syracuse, where he had secured another likely commit-

ment to a completely new hospital as witnessed by CASMED Clinician Kathy Franke. The sole alleged verbal PIP failure was being short one evaluation which Plaintiff disputes.

**No written review of the PIP was <u>ever</u> provided to Plaintiff.**

**21. The PIP requirements had included a number of calls per day with weekly verbal call reports which employee maintained satisfactorily per Herwig. A Requirement to Achieve 95% of quarterly sensor sales quota, Plaintiff over-achieved this primary requirement at 105% of quarterly sensor plan(115% YTD). Requirement to place 2 monitors in Q3, Plaintiff, over-achieved and placed 6 Each . Closure of 2 new revenue accounts was over-achieved at Mass General eval 1 (8/16) BIDMC EP, Yale Pediatrics, and Floating Pediatric with sensors purchased. Complainant also documented several new customers had also agreed, some in writing, to Trial/Evaluation of CASMED systems. And of course Plaintiff was still 880% of Total YTD Monitor Revenue Quota and approximately 120% YTD combined revenue.**

**As stated, some of these committed evaluations were the 2 additional systems at Mass General Hospital Units in process including CVOR, Yale EP, Bridgeport Hospital Orthopedic OR, Shoreline Hospital -Guilford CT Orthopedic OR, Maine Medical Center CVOR, Cape Cod Hospital CVOR to start in January as in writing and witnessed by George Galbraith (a Clinical Director at CASMED), and likely trials to be finalized at Dartmouth Hitchcock CVOR & EMMC CVOR etc.**

CASMED's <u>sole</u> verbally alleged point of Plaintiffs failure regarding the PIP claimed on the termination phone call was said to be finishing short by one evaluation/trial.  Herwig and Taylor said they would not accept trials with new monitor placements and new revenue at new centers within a hospital using the system elsewhere in the institution. This was contrary to Strusky and practice.  New Business at New Departments producing New Revenue requiring New Trials and New Sales Activities with New Clinicians, had, by now, historically been treated for what they are: Successful new business, the additional revenue growth being indistinguishable regardless of location. They would also not accept confirmed trials whose start date was to be selected by the customers.

Plaintiff also maintains that a number of his individual achievements were of such magnitude, that by common industry orthodoxy, they would to not only have protected him from termination but also would have placed him in high regard in Salesforce, especially given the condition of his territory at hire only 17 months earlier.

Plaintiff also maintains that his results published in objective published sale metrics reports of  CASMEDs 10 key achievement criteria will clearly demonstrates he was not treated on par with his younger counterparts nationally.

Also, CASMED demonstrably replaced the majority of its older sales managers and representatives by younger staff in the months immediately before and after Plaintiffs termination. Plaintiff was reportedly replaced by Brad Cangiamila someone in his 30s.

Plaintiff will demonstrate his dismissal for reasons other than age are not credible, fit a pattern of discrimination and do not fit the facts of his and others employment, including but not limited to counterparts who were accused by other CASMED employees of uncontested sexual harassment who were not terminated.

Plaintiff believes he can provide deposition at trial that will demonstrate while Herwig maintained the PIP was being conducted in good faith, that Herwig will be shown to have been in a process of recruiting a younger female MDT representative for Plaintiffs position seemingly before PIP was even commenced.

Plaintiff notes that while some sales did not proceed as a result of his removal from the territory, he expects a number of his efforts were in fact realized, and he seeks any such unpaid commissions, as determined at discovery, with the triple damages as provided under MGL c.149,s.148.

Finally, Plaintiffs salary was $75,000 per year with the majority of his income being strictly performance based.  CASMED posted an internet listing with its then contracted recruiter, Gillespie and Associates, after Plaintiffs termination in 10/16, of CASMED's Boston search seeking someone with <u>only 3-5 Years experience</u> and a stated salary of $75,000 and $75,000-85,000 at and above quota.

Plaintiffs 2016  9 month net income was over $170,000 or approximately $230,000 annualized for the entirety of 2016.

So Plaintiffs performance income is 144% of CASMED's published at quota job performance.  (This listing is consistent with those at Plaintiffs time of hire and post termination in 10/16).

<u>Therefore while Plaintiff is alleged to be underperforming he simultaneously is being paid by CASMED $70,000-$80,000 per year and 44% ABOVE published Boston Territory plan achievement.</u>

## <u>Age Discrimination in Violation of G.L. c. 151B</u>

22. Plaintiff, at age 63, is in a protected age group; he had been performing his job in an objectively satisfactory fashion; he has been subjected to adverse employment actions by Defendants CASMED, Herwig, Strusky and Patton; and younger, less qualified peers are held to different standards and are not subjected to such adverse employment actions.  The reasons given to Plaintiff by CASMED and Herwig for the adverse employment actions are false and pre-textual.

23.  The adverse treatment of Plaintiff by Defendants CASMED, Herwig, Strusky and Patton, constitutes discrimination based upon age, in the terms and conditions of employment in violation of General Laws Chapter 151B, §4(1).  CASMED, Herwig, Strusky and Patton, knew or had reason to know that its actions violated G.L. c. 151B §4(1).

24. The discriminatory actions of CASMED, Herwig, Strusky and Patton have caused Plaintiff substantial damages in the form of lost salary, lost commissions, loss of employment, diminishment of industry reputation and severe emotional distress.

25.  As guidance, Plaintiff had earned performance based income in excess of $170,000 in the last 9 months he was employed during 2016 with CASMED and has been unable to secure like employment since this wrongful termination.

**Unlawful Retaliation**

26. By complaining to CASMEDs Human Resources Director, Silvia Taylor & Strusky before and after being issued the PIP about ongoing discriminatory treatment by Defendant Herwig, Plaintiff was exercising his rights under M.G.L. c. 151B § 4(1).  The resulting and increased hostile treatment by CASMED, Herwig, Strusky and Patton after Plaintiff exercised his rights constituted unlawful retaliation in violation of M.G.L. c. 151B § 4(4).

27.  Plaintiff continues to suffer financial damages and emotional distress as a result of the unlawful retaliation by CASMED, Herwig, Strusky and Patton and also seeks relief of unpaid commissions, to be determined, under M.G.L c. 149 § 148 with a request for statutory triple damages.

WHEREFORE, Plaintiff requests that this Court grant the following relief:

1. Award damages to compensate Plaintiff for lost employment, salary, commissions, damage to industry reputation,   emotional distress and related statutory damages for unpaid commissions that may apply;

2. Award Plaintiff the costs and reasonable attorneys' fees of this action pursuant to G.L. c. 151B §4 and § 5;

3. Issue a Cease and Desist order to CASMED prohibiting any further age discrimination and/or retaliation against Plaintiff.

4. Award such other relief as the Court deems appropriate.

5. Plaintiff requests a trial by jury on all issues so triable.

Signed under penalties of perjury this 14th day of January, 2018.


Respectfully submitted,
Mark L. Scibelli by Himself,

Mark Scibelli
50 Indian Trail
Barnstable, MA 02630
(508) 725-7025
mlscibelli@icloud.com

21